**UNITED STATES of America**

v.

**600 BAGS OF SOUTHCOAST TURBINADO BRAND SUGAR.**

**Civ. A. No. 8818.**

United States District Court
W. D. Louisiana,
Shreveport Division.

Jan. 14, 1964.

Edward L. Shaheen, U. S. Atty., and Edward V. Boagni, Asst. U. S. Atty., Shreveport, La., for the Government.

John S. Stephens, Coushatta, La., for claimant to libeled articles.

BEN C. DAWKINS, Jr., Chief Judge.

The Government instituted this proceeding *in rem* by filing a libel of information pursuant to 26 U.S.C. § 7302, seeking forfeiture of six hundred 100-pound bags of sugar, seized by agents of the Alcohol and Tobacco Tax Unit of the Internal Revenue Service. Jurisdiction is based upon 26 U.S.C. § 7323 and 28 U.S.C. §§ 1355 and 1395.

Claimant, Chester C. Clift, intervened claiming that he is the owner of the seized sugar and that it is not subject to forfeiture. Upon joint motion of the parties, by order of the Court dated January 14, 1963, the sugar was sold to prevent its deterioration in storage. Claimant seeks to recover the proceeds of the sale.

When it was seized, Clift held the sugar as owner. It is subject to forfeiture only if it was "properly intended for use in violating the provisions of the internal revenue laws."[1] In oral argument the Government contended that whether Clift intended for the sugar to be used unlawfully did not matter as long as anyone intended to so use it. Apparently it has withdrawn from this position since in written brief it states, "Goods are forfeited, not because of their actual illegal use, but because the possessor holds them with intention to illegally use them."

---

1. Section 7302 of I.R.C., 1954, 26 U.S.C. § 7302. Section 3116 of the 1939 Code contained a similar provision, and thus the cases interpreting the required intent under that prior statute are indicative of a proper interpretation of Section 7302.

The intent of the possessor is the decisive factor in determining whether the property was intended for use in violating the provisions of the internal revenue laws.[2] Innocence of the owner as to direct violation of such laws will not prevent forfeiture unless the property seized was obtained from the owner by others without his consent and in violation of criminal laws.[3] If the property forfeited because of a liquor violation is an aircraft or vehicle, the Court under certain conditions may grant remission to the innocent owner.[4] For other property remission is a matter left to the discretion of the Secretary of the Treasury.[5]

The issue presented here is whether Clift intended for the sugar to be used in violation of the internal revenue laws. Of course, absent express acknowledgment, intent may be proven only circumstantially.

The facts are these: February 28, 1962, Clift was informed by one Frank Brian, a close friend with whom he had previously had business dealings, that a buyer for three hundred 100-pound bags of sugar per week was available; and, if Clift could supply the sugar, they would divide the profits equally. Clift, a self-styled "wheeler and dealer," who operated a small country store on his father's plantation, and held a retailer's license, admitted that Brian's request raised grave suspicions in his mind. Nevertheless, he testified that, without inquiring how the sugar would be used, and after shopping around for prices, he placed an order for three hundred 100-pound sacks of Market Basket sugar with Ardis-Ritchie Grocery Company, in Shreveport, Louisiana.

As justification for his action, Clift testified that he had a retail license for purchase of various supplies from wholesalers and that he sold barbwire, twine and anything else upon which he could make money. An effort was made by him to imply that he would have been reasonable in thinking that this large quantity of sugar might be going to a cattle-feeding operation, since Brian was a dealer in cattle and since molasses is sometimes used to sweeten certain cattle feed. However, his own primary business seems to be raising cattle and sheep, and he admitted that he had never used refined table sugar as a mixture in cattle feed, nor did he know of anyone else who had ever done so.

The sugar was ordered March 6, 1962. It arrived on March 7. Clift immediately informed Brian that the first shipment was ready for delivery. A stranger arrived at Clift's plantation early on the morning of March 8 and loaded the sugar into a truck bearing Mississippi license plates. According to Clift, he paid $3000.00 in cash for the sugar. Clift admitted that payment in cash also aroused his suspicions.

March 18, 1962, a large illicit distillery in the woods near Poplarville, Mississippi, was raided. At the still were one hundred twenty 100-pound bags of Market Basket brand sugar and about the same number of empty bags. Each bag contained stencil numbers 8–2, 17–3, or 22–2. J. Aron & Co., Inc., prepared Market Basket brand sugar exclusively for Ritchie Grocery Co., which had branch stores in several north Louisiana and south Arkansas cities. Eight hundred and thirty-six 100-pound sacks of Market Basket brand sugar bearing the specified serial numbers were prepared.

The Government attempted to trace movement of these sacks of sugar from the manufacturer to all ultimate buyers,

2. United States v. 2265 One-Gallon Paraffined Tin Cans, 260 F.2d 105 (5th Cir. 1958); United States v. One 1942 G.M.C. Tractor Truck, 182 F.2d 278 (7th Cir. 1950).

3. United States v. Bride, 308 F.2d 470 (9th Cir. 1962); Oliver v. United States, 170 F.2d 142 (5th Cir. 1948). Other extraordinary circumstances may prevent forfeiture. Beaudry v. United States, 79 F. 2d 650 (5th Cir. 1935).

4. 18 U.S.C. § 3617; United States v. One 1958 Pontiac Coupe, 298 F.2d 421 (7th Cir. 1962).

5. 26 U.S.C. § 7327.

including Clift, to show that the 240 sacks found at the still were the ones purchased by him and sold to the stranger. Although a chart showing the probable movement from manufacturer to still was introduced into evidence, it can serve only as an illustration of what might have happened. Certain evidence was properly objected to as not being the best evidence and no attempt was made to prove certain other information indicated on the diagram. If the attempted tracing of sugar were the only evidence before the Court, then we certainly could not hold that the sugar Clift sold was that found at the still. Nevertheless, it has been established that there was a good chance that some, and probably all, of the sugar Clift purchased bore stencil numbers 8–2, 17–3, or 22–2. When we add to this the highly suspicious circumstances under which Clift disposed of 30,000 pounds of sugar to a stranger in a truck bearing Mississippi license plates, the circumstantial evidence strongly supports the reasonable inference that the sugar was the same that was seized later at the Mississippi still.

Although we are convinced that the sugar Clift sold to the stranger probably was the same which was seized in Mississippi, that is not the sole determinative factor in this case. Clift admittedly purchased the sugar seized in this proceeding intending to sell it to the same man. If he believed that this sugar was going to be used to make illicit alcohol and intended to sell it for that purpose, then it is subject to forfeiture. This is true whether the sugar was for use at the Mississippi still or not.

After the first sale, Clift ordered Turbinado sugar from Frearing Grocery Company, because it was a little cheaper. He informed Brian that three hundred 100-pound sacks were ready for pick up. But the stranger did not return. Another three hundred sacks were delivered before Clift cancelled his order for sugar from Frearing. At the time of purchase,

Clift intended to sell the sugar to the same man who purchased the first three hundred sacks of sugar.

April 5 or 6, 1962, Joseph V. Filipek, an agent with the Alcohol and Tobacco Tax Unit, approached Clift, who voluntarily disclosed the six hundred sacks of sugar stored on his plantation. Clift told Filipek about a 40-year-old man, wearing a business suit, approaching him in the downtown Big Chain Cafeteria in Shreveport and, after discussing the feed business, asking him to supply three hundred sacks of sugar a week. At the trial Clift admitted he lied to Filipek and gave a very unconvincing reason for doing so.

In order to get the whole picture, the Court called, as its own witness, Frank Brian, who was the contact man between the "stranger" and Clift. Brian told a most improbable story. The Court simply cannot believe that these astute business men were as gullible as they would have us believe. They place considerable emphasis on the fact that their profit was small for the risk involved if they had intended to participate in an illegal operation. Nevertheless, we have only Clift's word as to how much cash the stranger paid him. Even if we were to accept his story as true (and we do not), the only inference reasonably to be drawn from the established facts is that Clift is bound to have known that the sugar seized, and the huge amounts to be handled in the future—15,600 sacks, or 1,560,000 pounds, per year—were going to an illegal distillery or distilleries, and that he intended to supply sugar for that purpose because he felt he could make a substantial profit by doing so.

A forfeiture proceeding is not a criminal action, but a civil one.[6] The burden of proof upon the Government is simply to show by a preponderance of the evidence that Clift intended for the sugar in his possession to be used in violation of the internal revenue laws.[7]

6. Kent v. United States, 157 F.2d 1 (5th Cir. 1946), cert. den. 329 U.S. 785, 67 S. Ct. 297, 91 L.Ed. 673 (1946).

7. Utley Wholesale Co. v. United States, 308 F.2d 157 (5th Cir. 1962).

This, we are convinced, the Government has done.

For these reasons, we conclude that the sugar properly was subject to forfeiture. A proper decree should be presented.